# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

HARRY LEE TOMBLIN,                          Case No. 1:10-cv-888

     Plaintiff                              Dlott, J.
                                            Litkovitz, M.J.
     vs

MICHAEL J. ASTRUE,                          **REPORT AND**
COMMISSIONER OF                             **RECOMMENDATION**
SOCIAL SECURITY,

     Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI) and disability insurance benefits (DIB). This matter is

before the Court on plaintiff's Statement of Specific Errors (Doc. 8), the Commissioner's

Memorandum in Opposition (Doc. 12), and plaintiff's reply. (Doc. 13).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1957 and was 51 years old at the time of the administrative law

judge's (ALJ) decision. Plaintiff finished the ninth grade and subsequently received his GED.

(Tr. 30). Plaintiff also had emergency medical technician and truck driving training, and served

in the Navy until he was discharged in 1980. (Tr. 30-31). Plaintiff has past relevant work

experience as a truck driver and laborer. (Tr. 31, 35).

Plaintiff first filed applications for disability insurance benefits (DIB) and supplemental

security income (SSI) on January 31, 2008, alleging a disability onset date of April 2, 2007 due

to leg, back and left shoulder pain, depression, and anxiety. (116-27). The applications were

denied initially and upon reconsideration. (Tr. 62-67, 70-76). Plaintiff then requested and was

granted a *de novo* hearing before an ALJ. (Tr. 77-81). On August 25, 2009, plaintiff, represented by counsel, appeared and testified at a hearing before ALJ Geraldine H. Page. (Tr. 30-52). Also, a vocational expert (VE), Robert Jackson, appeared and testified. (Tr. 53-56).

On October 19, 2009, the ALJ issued a decision denying plaintiff's SSI and DIB applications. (Tr. 9-25). The ALJ found that plaintiff met the insured status requirements for DIB through December 31, 2012. (Tr. 11). The ALJ determined that plaintiff suffers from the following severe impairments: lumbar spine problem, rotator cuff syndrome status post arthroscopy, obesity, depressive disorder, and an anxiety disorder. (Tr. 12). The ALJ found that these severe impairments, considered singly and in combination, do not meet or equal the level of severity described in the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.

The ALJ further determined that plaintiff has a residual functional capacity (RFC) to perform a range of light exertional work with the following limitations:

> [Plaintiff] can lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours out of 8; and sit for 6 hours out of 8. He can occasionally climb ramps and stairs, kneel, crawl, and stoop; and he can occasionally reach overhead with left upper extremity. He cannot climb ladders, ropes or scaffolds, or work around hazardous machinery, at unprotected heights, or on vibrating surfaces. His mental impairment impacts to the extent that he can tolerate no more than occasional interaction with the general public, and is limited to simple routine repetitive, unskilled tasks.

(Tr. 14).

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with above RFC. (Tr. 15). The ALJ further determined that plaintiff

could not perform his past relevant work as a truck driver, laborer, or byproducts operator; however, based on the VE's testimony, the ALJ determined that jobs exist in significant numbers in the national economy, such as inspector/grader, unarmed security guard, and mail clerk, that plaintiff could perform given the above RFC. (Tr. 23-24).

Plaintiff's request for review by the Appeals Council was denied (Tr. 1-4), making the decision of the ALJ the final administrative decision of the Commissioner.[1]

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423(a). Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental

---

[1] Plaintiff subsequently reapplied for and was granted social security benefits after undergoing spinal surgery in January 2011. Plaintiff was found disabled with an onset date of January 1, 2010. (Doc. 8, p. 1). Consequently, the instant matter is limited to whether the ALJ's determination that plaintiff was not disabled for the closed period of April 2, 2007 to December 31, 2009 is supported by substantial evidence.

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations which is the same for purposes of both DIB and SSI benefits. *See* 20 C.F.R. §§ 404.1520, 416.920; *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524 (6th Cir. 1981). The Commissioner may meet his burden

4

of identifying other work the claimant can perform through reliance on a vocation expert's testimony to a hypothetical question. However, to constitute substantial evidence in support of the Commissioner's burden, the hypothetical question posed to the vocational expert must accurately reflects the claimant's mental and physical limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002); *Varley v. Sec'y of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The Commissioner is required to consider the individual's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If the individual suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk,* 667 F.2d at 528.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of H.H.S.,* 773 F.2d 85, 90 (6th Cir.1985) (citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that

plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Sec'y of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Sec'y of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Sec'y of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson*, 735 F.2d at 964 (emphasis in original); *O'Banner,* 587 F.2d at 323. Taking notice of job availability and requirements is disfavored. *Kirk*, 667 F.2d at 536-37 n.7, 540 n.9. There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson,* 735 F.2d at 964; *Kirk,* 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips* v. *Harris,* 488 F. Supp. 1161 (W.D. Va. 1980) (citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a

vocational expert is required to show the availability of jobs that plaintiff can perform. *Born*, 923 F.2d at 1174; *Varley*, 820 F.2d at 779.

In weighing the various medical opinions of record, an ALJ must consider factors such as the length, nature and extent of the treatment relationship; the frequency of examination; the medical specialty of the physician; how well-supported by evidence the opinions are; and how consistent an opinion is with the record as a whole. 20 C.F.R. § 416.927(d)(2)-(6); *Ealy*, 594 F.3d at 514. When evaluating medical opinions, an ALJ must generally accord greater weight to the opinions of a treating physician than to those of a physician who examined a claimant only once. *Walters v. Comm'r*, 127 F.3d 525, 530-31 (6th Cir. 1997). The opinion of a non-treating but examining source is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy*, 594 F.3d at 514 (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r*, 482 F.3d 873, 875 (6th Cir. 2007)). The weight to be accorded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinion and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 416.927(d)(3).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for

doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Sec'y of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley*, 820 F.2d at 782. The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL RECORD

The medical record contains plaintiff's medical treatment since 1994.

In July 1994, plaintiff underwent left rotator cuff repair surgery, performed by Jack Steel, M.D., subsequent to a work-related injury. (Tr. 262-63).

In March 2006, plaintiff was treated by Harry J. Bell, M.D., for complaints of low back and leg pain. Plaintiff reported aching and numbness, and a worsening of symptoms. Plaintiff

described the pain as constant and activity dependent, stated that the symptoms increased during work activities, and reported that the episodes of pain were becoming more frequent. Examination results showed 30 degrees of flexion with increased pain, 0 degrees of extension with increased pain, and tenderness to palpation over left posterior superior iliac spine. Plaintiff's gait was mildly antalgic and Dr. Bell diagnosed him with lumbar spondylosis without myelopathy, lumbar spinal stenosis, and lumbar radiculitis, congenital lumbar spondylolysis and acquired lumbar spondylolisthesis, grade I. Dr. Bell recommended corticosteroid injections, exercise, and prescribed Tramadol. (Tr. 3538-40).

Dr. Bell administered corticosteroid injections to plaintiff's back at L5/S1 in April 2006. (Tr. 3551-52). Post-procedure plaintiff was diagnosed with multilevel disc degeneration and spondylosis, Grad I spondylolisthesis of L5 on S1, severe L5/S1 spinal stenosis, left L5 radiculitis and low back and left leg pain. *Id*. Plaintiff received another corticosteroid injection in May 2006 and Dr. Bell's examination yielded similar diagnoses. (Tr. 3547-50)

In March 2007, Dr. Bell completed a medical assessment for plaintiff's workers' compensation claim. Dr. Bell diagnosed plaintiff with HNP (herniated nucleus pulposes) without myelopathy and a back contusion and opined that plaintiff was limited to standing and walking one hour, and to sitting six hours, in an eight hour work day. Further, Dr. Bell stated that plaintiff could occasionally bend, squat, crawl, climb, and reach; frequently lift/carry up to ten pounds; and occasionally lift/carry up to 25 pounds. (Tr. 3228).

On March 1, 2007, plaintiff was treated by Michael E. Brock, D.O., for complaints of leg pain following a slip and fall on ice. Plaintiff reported landing with his full weight on his left leg and being unable to walk on it, and stated that his pain was 8/10. Dr. Brock noted minimal

bruising and small muscle spasms in plaintiff's left fibular shaft and recommended an x-ray.[2] (Tr. 3618-19).

On March 19, 2007, plaintiff was treated by Dr. Bell for complaints of frequent left shoulder pain. Plaintiff reported that the pain had been present for over two years but was gradually worsening. Dr. Bell noted mild tenderness over the left acromioclavicular joint, decreased flexion and extension with increased pain, positive left Neer's and right Hawkin's tests, and 4/5 muscle strength in the left supraspinatus, but otherwise the findings were unremarkable. Dr. Bell opined that plaintiff had rotator cuff syndrome left, status post rotator cuff repair 1995, osteoarthritis of shoulder signs, and subacromial bursitis left and recommended physical therapy, MRI, and a surgical consult. (Tr. 3180-82).

A May 7, 2007 MRI of plaintiff's left shoulder demonstrated a moderate impingement on the supraspinatus tendon, diffuse tendinosis within the supraspinatus tendon, and a partial rotator cuff tear. (Tr. 3152-53).

Plaintiff returned to Dr. Bell in June 2007 with complaints of increased shoulder pain and weakness. Examination results were similar to the March 2007 exam, though a moderate decrease in left shoulder rotation was noted. Further, Dr. Bell included a new diagnosis of rotator cuff syndrome with impingement left. Dr. Bell again recommended a surgical consultation and physical therapy depending on the results of the consult. (Tr. 3208-10).

On July 20, 2007, plaintiff received a corticosteroid injection to his left subacromial bursa to treat his shoulder pain. (Tr. 3387). Plaintiff reported a 75% reduction of pain within two minutes of the injection. (Tr. 3388).

_____

[2] The x-ray was negative for fractures and dislocation. (Tr. 3625)

Plaintiff saw Dr. Steel on August 14, 2007 for a surgical consultation. Dr. Steel noted that plaintiff had forward flexion of 180 degrees with pain, internal rotation of 70 degrees, external rotation of 85 degrees, and abduction of 90 degrees with impingement pain. Plaintiff's external range of motion was 4+, and his internal rotation was 4 with moderate pain. Dr. Steel diagnosed plaintiff with bicipital tenosynovitis, impingement syndrome, and rotator cuff sprain, strain, and tear. Dr. Steel opined that the shoulder injury had progressed since plaintiff's prior surgery to a full thickness tear which required further treatment, possibly another surgery, but recommended that plaintiff start physical therapy as a first resort. (Tr. 3330-31).

On August 28, 2007, plaintiff returned to Dr. Bell for complaints of low back and leg pain. Plaintiff reported that the pain was constant, had worsened since his last visit, and was aggravated by prolonged positioning and sitting. Examination results were similar to those in March 2006. Dr. Bell recommended a lumbar spine MRI, home exercise, and a series of lumbar epidural steroid injections, depending on the results of the first injection. (Tr. 3323-25).

At a September 4, 2007 follow-up with Dr. Bell, plaintiff reported that his shoulder pain was unchanged since his June visit, but he did note some temporary improvement after the July 20, 2007 corticosteroid injection. Examination results were unchanged from prior findings. Dr. Bell recommended that plaintiff continue physical therapy based on Dr. Steel's consultation and noted that corticosteroid injections were not indicated at the time as surgical intervention was required and the beneficial results of the injections had been brief. (Tr. 3315-17).

Dr. Bell administered a corticosteroid injection to plaintiff on September 26, 2007 at L5/S1 for back pain, noting that it had been 16 months since his last injection. Plaintiff reported

an increase of symptoms to his left leg and Dr. Bell noted that his gait was mildly antalgic.  (Tr. 3377).

Plaintiff returned to Dr. Bell on October 16, 2007, and reported that his shoulder pain was moderately improved for several weeks following the corticosteroid injection.  Plaintiff expressed concern about going to physical therapy due to increased pain with activity.  Dr. Bell continued to recommend it but also noted that therapy had limited benefits for shoulder impingement.  The physical examination yielded findings similar to prior visits, but plaintiff's gait was noted as normal with no antalgia.  (Tr. 3309-11).

Physical therapy progress notes from October and November 2007 indicate that plaintiff continued to experience shoulder pain, but was making gradual improvements. (Tr. 3302-05, 3463-66, 3472-74, 3476-89).  Plaintiff received a second corticosteroid injection on October 10, 2007 at which time he reported a 50% reduction in pain, but was again exhibiting a mildly antalgic gait.  (Tr. 3379).  On October 24, 2007, plaintiff received the third corticosteroid injection and Dr. Bell again noted that his gait was mildly antalgic.  (Tr. 3372).

On October 29, 2007, Nicholas Ahn, M.D., reviewed plaintiff's medical records for the Bureau of Workers' Compensation.  Dr. Ahn opined that plaintiff's current pain and symptoms were unrelated to his 1994 work-injury; rather, they were consistent with age-related, physiologic degenerative changes.   (Tr. 3494-95).

At a November 7, 2007 follow up with Dr. Bell, plaintiff reported 50% to 75% improvement in his symptoms resulting from the corticosteroid injections.  Dr. Bell noted that the current symptoms, pain, aching, and numbness started in March of 1999, and that plaintiff's gait was mildly antalgic.  Plaintiff was advised to continue his physical therapy regimen and

13

further corticosteroid injections were not advised as plaintiff's pain was adequately controlled at the time. (Tr. 3369-71).

Plaintiff returned to Dr. Bell on December 4, 2007 for follow up with his low back and leg pain. Dr. Bell noted that plaintiff's lumbar and radicular symptoms had improved following corticosteroid injections, specifically noting "an excellent reduction in back and leg pain," and moderate functional improvement, but plaintiff still exhibited a mildly antalgic gait. Dr. Bell continued to recommend ongoing physical therapy and advised against further injections as plaintiff's pain was under control. (Tr. 3366-68).

Plaintiff also followed up with Dr. Steel on December 4, 2007. Pursuant to examination, Dr. Steel noted that plaintiff had forward flexion of 175 degrees, external rotation of 85 degrees and internal rotation of 80 degrees, while other findings were similar to the August 2007 exam. Dr. Steel reported that plaintiff had shown little improvement and recommended surgery. (Tr. 3457-58).

Dr. Bell saw plaintiff again on January 15, 2008 for follow up on his shoulder pain. Examination results were similar to the previous visit, but plaintiff was noted as walking with a normal gait. Dr. Bell recommended that plaintiff stop engaging in physical therapy due to prior poor responses and opined that the degree of shoulder impingement and restriction in movement present in plaintiff's evaluation of March 19, 2007 precluded his ability to work in his usual occupation. (Tr. 3505-07).

On February 6, 2008, James H. Rutherford, M.D., reviewed plaintiff's medical records and opined that plaintiff's rotator cuff tear was not caused by his work-injury, noting that the tear was not present at the time of the 1995 arthroscopic surgery. (Tr. 3562).

14

Dr. Steel drafted a letter on April 9, 2008 for workers' compensation purposes describing plaintiff's 1994 surgery and recent treatment since the return of his shoulder pain in 2007. Dr. Steel explained that plaintiff had not responded to a prolonged course of conservative treatment and was a candidate for arthroscopic decompression surgery. Dr. Steel opined that plaintiff's current condition was a continuation from his 1994 work-related injury, specifying that it is not uncommon to significantly improve and then experience subsequent deterioration and function years after surgery. Though plaintiff has degenerative arthritic change in the acromioclavicular joint which has progressed with time and contributed to his impingement problems, Dr. Steel stated that the rotator cuff finding is consistent with a progression of the original 1994 injury. (Tr. 3797-99).

Plaintiff returned to Dr. Bell on April 29, 2008 and was noted as being depressed, having a mild pitting edema in his calf, and walking with a moderately antalgic gait. Dr. Bell recommended a lumbar spine MRI, discontinuing Celebrex due to the edema, and a spine surgery consult if leg pain is not responsive to corticosteroid injection treatment. Dr. Bell opined that spinal cord stimulation may be beneficial for plaintiff's neuropathic pain if he does not respond to the injections. (Tr. 3630-32).

On May 4, 2008, James H. Gosman, M.D., did an independent evaluation of plaintiff's medical records for the Bureau of Workers' Compensation. Dr. Gosman opined that plaintiff's shoulder pain and rotator cuff tear were consistent with age-related, age-appropriate degenerative changes, and were not related to plaintiff's 1994 work injury. (Tr. 3784-87).

W. Jerry McCloud, M.D., a non-examining agency doctor, completed a physical residual functional capacity (RFC) assessment on May 6, 2008. Dr. McCloud opined that plaintiff could

occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand, walk or sit for six hours in an eight hour day; frequently stoop, balance, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. Plaintiff was limited in his ability to reach and had no limits on pushing or pulling. Dr. McCloud further opined that plaintiff's symptoms could be expected based on his medically determinable impairments, and, giving weight to Dr. Bell's conclusions, that plaintiff's statements as to his limitations due to pain, achiness, and numbness were credible. Dr. McCloud noted that he had not reviewed any statements from plaintiff's treating physicians regarding plaintiff's physical capacities.[3] (Tr. 3680-87).

A consultative examination was performed by Drew C. Apgar, M.D., on May 16, 2008. An x-ray of the thoracic spine revealed mild anterior wedging at several vertebral levels with more significant loss at the T8 level. Plaintiff got on and off the examination table and walked around the room with difficulty, demonstrating an antalgic, unsteady gait that was not fully weight-bearing. Plaintiff exhibited +2/4 tendon reflexes at all stations, and his muscle strength was +5/5 in upper and lower extremities. Plaintiff's range of motion in his right shoulder was restricted in flexion at 130 degrees and abduction at 95 degrees and in his left shoulder with flexion at 116 degrees and abduction at 108 degrees. No joint abnormality was observed or palpated. Plaintiff denied feeling depressed. Dr. Apgar diagnosed plaintiff with chronic pain syndrome, chronic obstructive pulmonary disease, chronic alcohol use by history, hypertension by history, obesity, and gastroesophageal reflux disease by history. Dr. Apgar opined that plaintiff would have no difficulty handling objects with his dominant, right hand, or hearing and

---

[3] Though Dr. McCloud gave weight to Dr. Bell's opinions, it appears that he relied solely on Dr. Bell's January 2008 treatment notes, as he noted that plaintiff had a normal gait, Tr. 3681, despite numerous findings from Dr. Bell that plaintiff had a mildly to moderately antalgic gait. Further, Dr. McCloud reported that there were no medical opinions regarding plaintiff's physical capacities, Tr. 3686, indicating that he did not review Dr. Bell's February 2007 assessment. (Tr. 3228).

speaking; however, he may have some difficulty with standing, walking, sitting, lifting, carrying, pushing, pulling, and travelling. Dr. Apgar found plaintiff's mental status to be essentially normal; his understanding and memory were intact; he was able to maintain concentration and focus throughout the examination; and his interaction and adaptation were appropriate. (Tr. 3689-707).

A May 28, 2008 MRI of plaintiff's lumbar spine showed displacement and discogenic endplate disease at L5-S1 and severe bilateral L5-S1 foraminal stenoses with likely impingement on bilateral L5 nerve root sleeves. (Tr. 3634). Plaintiff received another series of corticosteroid injections for his back pain from June to July 2008. (Tr. 3892-97).

July 24, 2008 progress notes from Dr. Bell demonstrate that plaintiff experienced a 50% reduction in pain after the recent series of corticosteroid injections. Dr. Bell noted that plaintiff had a depressed affect and walked with moderate antalgia. Dr. Bell advised against physical therapy due to prior poor responses, and recommended a spinal surgery consultation if plaintiff did not respond to conservative treatment. (Tr. 3889-91).

Plaintiff underwent a consultative psychological examination with Paul A. Deardorff, Ph.D, on August 10, 2008. Plaintiff reported ongoing pain and headaches, and depression and anxiety. Dr. Deardorff noted that plaintiff was cooperative, though he appeared depressed and in pain, and did not appear to exaggerate or minimize his difficulties. Plaintiff's conversation and thoughts were adequately organized and he reported frequent anxiety and ongoing depression, including occasional crying spells. Plaintiff reported that he had previously experienced suicidal ideation, including a prior attempt, but was not currently suicidal and did not have a plan. Plaintiff further reported that he had low energy, was easily fatigued, and had previously been

17

psychiatrically hospitalized.  Dr. Deardorff noted that plaintiff did not display autonomic or motoric indications of anxiety, but alluded to symptomatology suggestive of posttraumatic stress disorder and acknowledged a sense of impending doom.  Dr. Deardorff opined that plaintiff's complaints of pain, fatigability, and limited energy could indicate somatization.  Plaintiff exhibited difficulty with his short-term memory and attention and concentration skills, his reasoning abilities were marginally adequate, and his general level of intelligence appeared to fall in the low-average range.  Plaintiff reported that he does not often leave his home, has only one friend who he does not see, and usually watches a little television, listens to music, and uses the computer.  Dr. Deardorff diagnosed plaintiff with major depressive disorder, recurrent, without psychotic features, anxiety disorder, and alcohol abuse in remission and assigned him a GAF[4] of 45.  Regarding plaintiff's mental work-related abilities, Dr. Deardorff opined that he was moderately impaired in his ability to relate to others; moderately impaired in his ability to understand, remember, and follow simple instructions; moderately impaired in his ability to maintain attention, concentration, persistence, and pace; and moderately impaired in his ability to withstand the stress and pressures associated with day-to-day work.  (Tr. 3810-15).

In September 2008, non-examining psychologist, Tasneed Khan, Ed.D, completed a mental residual functional capacity assessment based on Dr. Deardorff's evaluation and determined that plaintiff was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for

---

4

"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 F. App'x. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruption form psychologically based symptoms; perform at a reasonable pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. Dr. Khan gave great weight to Dr. Deardorff's opinions and adopted his diagnoses adding that, while plaintiff has some limitations, he has a significant functional capacity and would optimally perform in a setting with minimal interaction requiring only superficial relations, with routine and predictable duties. Dr. Khan further stated that plaintiff's statements were partially credible, noting the inconsistency between his statement that he does not leave home and his arriving unaccompanied at the clinical evaluation. (Tr. 3817-34).

Non-examining agency physician Myung Cho, M.D., affirmed the physical RFC assessment completed by Dr. McCloud on October 7, 2008. (Tr. 3835).

On October 15, 2008, plaintiff returned to Dr. Steel to discuss surgical options for his shoulder. Dr. Steel recommended surgery, specifically arthroscopy on the left shoulder including treating any abnormality found. (Tr. 3838-39). Plaintiff had the procedure on October 17, 2008, which revealed an intact left rotator cuff with type 1 glenoid superior labrum from anterior to posterior (SLAP) tear with subacromial impingement including subacromical and subclavicular spurring. (Tr. 3840-45).

Dr. Bell saw the plaintiff after his shoulder surgery on October 23, 2008. Dr. Bell noted plaintiff's affect was depressed and that he demonstrated a moderately antalgic gait. (Tr. 3886-88).

January 2009 progress notes from Dr. Bell indicate that plaintiff walked with a mildly antalgic gait. Dr. Bell again recommended a series of corticosteroid injections for plaintiff's back and leg pain, and that plaintiff get a spinal surgery consultation depending on his response to the injections. (Tr. 3883-85).

February 2, 2009 progress notes from Dr. Steel indicate that plaintiff had improvement to his left shoulder with complaints of mild soreness. Dr. Steel recommended plaintiff would be relased to work on February 10, 2009, after completing physical therapy. (Tr. 3848-49).

Plaintiff received corticosteroid injections from Dr. Bell on February 2, February 16, and March 16, 2009 for his back pain. (Tr. 3874, 3879-80). At the February 2009 follow-up, plaintiff was noted as having a normal gait; however, at the March 2009 follow-up, plaintiff reported a less than 25% improvement from the March injection and Dr. Bell noted that plaintiff walked with mild antalgia left. (Tr. 3872-73, 3876-78).

The record further includes September 2008 to July 2009 treatment notes from plaintiff's primary care physician, Rita A. Slone, M.D., who treated him for sleeplessness, hypertension and cough. (Tr. 3904-53). A June 29, 2009 assessment form notes that plaintiff was feeling somewhat better following his shoulder surgery, but was continuing to have shoulder aches, and that he was fidgeting and anxious during the exam. (Tr. 3915-16). In September and November 2008, and January 2009, plaintiff's gait was noted as being within normal limits. (Tr. 3916, 3932, 3940, 3945).

# PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he underwent surgery on his shoulder in 1994 and 2008, but continues to experience pain and numbness in his shoulder and arm. (Tr. 36, 45). He explained that he received a series of injections in his back, from 2006 to 2009, that temporarily relieved his pain. (Tr. 46). Plaintiff reported that he had back pain and numbness due to disc bulges that radiates down his leg and stated that he regularly takes medication for the pain. (Tr. 36-37). Plaintiff further testified that he experiences pain in his neck and upper back. (Tr. 38). Plaintiff explained that he had experienced this shoulder and back pain prior to 2007, while he was still working, and that, if he had not been laid off, he would have been unable to continue to working due to his pain. (Tr. 45).

Plaintiff testified that he was not in therapy for his depression, but had been taking medication, Citalopram, for two months and that his recent psychological treatment was limited to the consultative evaluation performed by Dr. Deardorff. (Tr. 38, 40). However, plaintiff stated that he had been hospitalized in 1990 for several days due to a domestic incident with his wife after he returned home intoxicated. (Tr. 39). Plaintiff stated he had received treatment for alcohol abuse in 1977 or 1978, but his last drink was in 2004 or 2005. *Id.* Plaintiff further testified that he did not think he had anxiety problems and was not taking medication for anxiety. (Tr. 39-40).

Plaintiff testified that he had difficulty walking and sometimes experiences significant back pain just walking to the kitchen and making sandwiches, but other times he can walk for up to 45 minutes before the pain starts. (Tr. 40-41). He reported that he often needs to change positions and can stand for ten to 45 minutes at a time, depending on the day and pain. (Tr. 41).

21

Plaintiff further testified that he can comfortably sit for 20 to 30 minutes before needing to shift position. (Tr. 46). Plaintiff stated that he drives to buy groceries, and that usually his pain bothers him before he's halfway done. (Tr. 41). Plaintiff described driving as painful and explained that he rarely drives, except to attend doctor's appointments, and only goes grocery shopping when he is already out. (Tr. 41, 46). He also testified that he has difficulty climbing stairs and will take an elevator, even if only to go up one flight. (Tr. 50-51).

Plaintiff testified that he has difficulty sitting due to his back pain and that he does not do any lifting, even around the house. (Tr. 42). He stated that, during physical therapy, exercises requiring him to pull caused him significant pain. (Tr. 47-48). Plaintiff testified that he is able to feed, bath, and groom himself, but stated that he typically doesn't cook aside from making sandwiches or microwaving food. (Tr. 42-43). He reported that he typically does not do dishes, mow the lawn, or do house or yard work, but recently has done the dishes because his wife has not been at home. (Tr. 43). Plaintiff explained that he has difficulty sleeping and, even after taking sleeping pills, sometimes wakes up several times throughout the night. (Tr. 42-43).

Plaintiff testified that on a typical day, he wakes up and watches television on the couch, alternating between sitting and laying down; makes sandwiches for lunch, unless his pain is too intense, in which case he heats something up; does the same for dinner; and then continues to sit or lay down and watch television until bedtime. (Tr. 43-44).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE testified that plaintiff had past relevant work experience as a truck driver, which was medium and semi-skilled work, and a laborer, which was heavy and unskilled work. (Tr. 53). The ALJ asked the VE to assume an individual such as plaintiff who is limited to lifting

and carrying no more than 20 pounds occasionally, 10 pounds frequently, standing and walking no more than six hours in an eight hour day, sitting for no more than six hours in an eight hour day, occasionally climbing stairs and ramps, kneeling, crawling, stooping, crouching, and reaching with the left upper extremity, including overhead reaching, who is not required to work around hazardous machinery and unprotected heights, climb ladders, ropes, or scaffolds, or work on vibrating surfaces, and who can do simple, routine, repetitive and unskilled work, with occasional interaction with the general public. (Tr. 54). The VE testified that such a person would not be able to do plaintiff's past work as he performed it or as it is customarily performed. *Id*. The ALJ then asked the VE to assume an individual of plaintiff's age, education, and past work experience, with the same physical limitations. *Id*. The VE testified that such an individual would be able to perform light level, unskilled work, such as inspector, grader, unarmed security guard, and mail clerk. (Tr. 54-55).

The ALJ then asked the VE to assume an individual with these limitations who would be off task 30 to 40 percent of any work day due to absences greater than two times a month or interruptions in concentration, persistence and pace. The VE testified that such an individual would not be able to perform claimant's past work or any other work. (Tr. 55).

Plaintiff's attorney asked the VE to assume an individual who was able to walk for a maximum of 45 minutes at a time, able to stand for ten minutes to one hour at a time, able to sit for 20 to 30 minutes at a time before needing to stand, and required the ability to shift position while sitting. The VE testified that such an individual would be precluded from work. (Tr. 56).

**OPINION**

Plaintiff assigns four errors in this case: (1) the ALJ failed to properly designate what weight was afforded to the medical opinions of record; (2) the ALJ improperly discounted Dr. Bell's RFC assessment; (3) the ALJ erroneously discounted plaintiff's credibility regarding his complaints of pain; and (4) the ALJ posed insufficient hypothetical questions to the VE in assessing plaintiff's ability to engage in substantial gainful activity. Plaintiff's first two assignments of error will be addressed together. For the following reasons, the Court finds the instant matter should be reversed and remanded.

**I.      The ALJ erred by failing to address Dr. Bell's opinion regarding plaintiff's physical abilities.**

The ALJ determined that plaintiff had an RFC for a range of light work:

> [He] can lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours out of 8; and sit for 6 hours out of 8. He can occasionally climb ramps and stairs, kneel, crawl, and stoop; and he can occasionally reach overhead with [his] left upper extremity. He cannot climb ladders, ropes or scaffolds, or work around hazardous machinery, at unprotected heights, or on vibrating surfaces.

(Tr. 14).

In contrast, Dr. Bell, plaintiff's treating physiatrist, gave plaintiff an RFC for sedentary work in March 2007. (Tr. 3228). Plaintiff contends the ALJ erred in not giving Dr. Bell the most weight or controlling weight under 20 C.F.R. § 404.1527(d) and SSR 96-2p (1996). Plaintiff asserts the ALJ failed to note or discuss Dr. Bell's March 2007 RFC assessment in her decision.[5] For the reasons that follow, the Court finds plaintiff's first and second assignments of error well-taken.

---

[5] If plaintiff is limited to sedentary work, he would be considered "disabled" under Grid Rule 201.14.

The Sixth Circuit has recently reaffirmed the long-standing principle that the "ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2)). When the ALJ declines to give controlling weight to a treating physician's assessment, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406.

In accordance with this rule, the ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion, based on the evidence in the record, and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision. *Id*. at 406-07 (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996 WL 374188, at *5; *Wilson*, 378 F.3d at 544). The ALJ's failure to adequately explain the reasons for the weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (emphasis in the original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)).

In this case, the ALJ recognized that as a treating physician, Dr. Bell's opinions were entitled to "significant weight." (Tr. 17) ("As Dr. Bell is the [plaintiff's] treating physician, his opinion is given significant weight."). Specifically, the ALJ stated she gave "significant weight" to Dr. Bell's treatment notes and records of May, October and December 2007, January 2008, and March 2009. (Tr. 17, 22).

The ALJ's decision, however, makes no mention of Dr. Bell's March 2007 opinion limiting plaintiff to sedentary work. Given the ALJ's silence, the Court cannot discern from the instant record whether the ALJ overlooked, ignored, or rejected Dr. Bell's March 2007 RFC assessment. As a result of this omission, the ALJ failed to comply with her duty to weigh Dr. Bell's opinion in accordance with 20 C.F.R. § 404.1527(d) and to give good reasons for the ultimate weight given to plaintiff's treating physician. *Blakley*, 581 F.3d at 407. Accordingly, the ALJ committed an error of law when she failed to address and evaluate Dr. Bell's March 2007 RFC assessment in accordance with Sixth Circuit precedent and Social Security regulations and give "good reasons" for not accepting his opinion regarding plaintiff's RFC.

The Commissioner concedes that the ALJ did not discuss or indicate the weight given to Dr. Bell's March 2007 opinion. (Doc. 12, p. 9). Nevertheless, the Commissioner argues this is harmless error as Dr. Bell's RFC assessment was so deficient that the ALJ "could not possibly credit it[.]" *Wilson*, 378 F.3d at 547. Further, the Commissioner, relying on *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006), asserts the ALJ's decision implicitly provided sufficient reasons for rejecting Dr. Bell's RFC, and thus met the goal of § 404.1527(d)(2) despite not complying with its explicit terms. The Commissioner's arguments are misplaced.

In *Nelson*, as in the instant matter, the ALJ did not explicitly reject the opinion of the plaintiff's treating physician or provide an indication of what weight was given to the medical opinions relating to the plaintiff's limitations. However, in *Nelson*, the ALJ directly questioned the VE as to how the rejected doctors' opinions would affect the plaintiff's ability to work, demonstrating that the ALJ was aware of and had acknowledged the existence of the rejected opinions. Here, however, there is no such evidence from which the Court can infer that the ALJ even reviewed Dr. Bell's RFC assessment, making it impossible to determine if the ALJ intended to implicitly reject the opinion. *See Blakley*, 581 F.3d at 409.

Moreover, the Sixth Circuit has held that the *Nelson* "harmless error" argument does not apply where an ALJ's decision is inconsistent "in that it accept[s] the treating physician's opinion in some respects but reject[s] it in others without explanation." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 748 (6th Cir. 2007) (citing *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 461-62 (6th Cir. 2005)). Here, as in *Hall*, the ALJ accepted portions of Dr. Bell's opinions and failed to address others, specifically, the RFC assessment. The ALJ provided no explanation, implicitly or otherwise, for not addressing these records leaving the Court unable to discern the ALJ's reasons for the weight given to Dr. Bell's opinion; accordingly, remand is appropriate. *Id.* The ALJ should have complied with the requirements of § 404.1527(d)(2) and provided an explicit basis, including giving "good reasons," for not adopting Dr. Bell's RFC assessment. *See Wilson*, 378 F.3d at 545. By failing to do so, the ALJ deprived this Court of the ability to conduct a meaningful review of the decision. *Id*. at 544.

The ALJ also erred by adopting the RFC of the non-examining agency doctor, Dr. McCloud, over the RFC of plaintiff's treating physician without providing any basis for doing so. Notably, Dr. McCloud reported that he gave weight to Dr. Bell's medical opinions, but incorrectly noted that there was no treating physician RFC assessment in the file (Tr. 3685-86), indicating that Dr. McCloud's review was based on a limited portion of the medical record, detracting from its supportability. *See* 20 C.F.R. § 404.1527(f)(1), (2)(ii). Moreover, as a non-examining reviewing physician, Dr. McCloud's opinion should have been given less weight than Dr. Bell's opinion with regard to plaintiff's RFC. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) ("'[T]he opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'") (quoting *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).

Finally, the Commissioner contends that Dr. Bell's RFC assessment was deficient in that it was generated one month prior to plaintiff's alleged onset date of April 2, 2007 and did not specify whether the restrictions were temporary or permanent. (Doc. 12, p. 9). Despite the Commissioner's contention, there is no evidence of record that Dr. Bell's RFC assessment was "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. In fact, plaintiff's history of injuries and surgery, the results of physical examinations and multiple diagnoses of significant back impairments, and x-ray and MRI results "present objective findings that are, at the very least, not inconsistent with [Dr. Bell's RFC assessment]." *Blakley*, 581 F.3d at 409-10.

The record demonstrates that Dr. Bell has treated plaintiff for nearly a decade, from September 1999 (Tr. 799) to March 2009. (Tr. 3872). While plaintiff did not see Dr. Bell

consistently throughout the years, he did see Dr. Bell frequently in 2006 for back pain and corticosteroid injections. (Tr. 3538-40; 3551-52; 3547-50). Further, plaintiff treated with Dr. Bell on an almost monthly basis from March 2007 to March 2009 for back and shoulder pain.[6] Throughout 2007 to 2009, Dr. Bell continually recommended back and shoulder surgery to address plaintiff's ongoing pain. (Tr. 3180-82; Tr. 3208-10; Tr. 3315-17; Tr. 3630-32; Tr. 3886-88; Tr. 3889-91; Tr. 3883-85). Plaintiff attempted to get this surgery, but his requests were rejected by workers' compensation. *See* Tr. 32-33. *See also* Tr. 3855-67 (demonstrating plaintiff's multiple requests for surgery and subsequent denials by workers' compensation). Further, results from Dr. Bell's examinations in August and December 2007, that plaintiff had restricted range of motion in his back, an antalgic gait, positive straight leg raising, and decreased pain with limited activities, *i.e.*, plaintiff's pain was aggravated with prolonged positioning and lessened with frequent position shifting, are consistent with the March 2007 RFC assessment for sedentary work. (Tr. 3323-25; 3366). Looking to the factors the ALJ is required to consider in weighing Dr. Bell's opinion under § 404.1527(d) - the nature and length of plaintiff's treatment relationship with Dr. Bell, the frequency of examination, the supporting objective examinations and tests, the consistency of Dr. Bell's opinion, and Dr. Bell's specialization as a physiatrist – the ALJ should have addressed the March 2007 RFC assessment.

The mere fact that Dr. Bell's RFC assessment was written a month before the alleged onset date is not a sufficient basis, in light of the § 404.1527(d) factors, to completely ignore the opinion of plaintiff's long time treating physician or discount it as "patently deficient." Further, it does not stand to reason that Dr. Bell's failure to specify the length of the restrictions assigned

---

[6] There are no treatment notes from Dr. Bell for July to October 2008; however, plaintiff resumed his regular monthly visits following his October 2008 rotator cuff surgery.

to plaintiff in March 2007 is a sufficient basis to reject his opinion. If the ALJ was hesitant to afford weight to Dr. Bell's RFC assessment because it lacked a temporal restriction, she should have recontacted Dr. Bell to clarify the record. *See* 20 C.F.R. 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved [or] does not contain all the necessary information[.]"). Lastly, Dr. Bell's March 2007 RFC assessment (Tr. 3228) is identical to an RFC assessment he completed in July 2006, except that in the latter Dr. Bell noted the restrictions were permanent. (Tr. 2983). This indicates that the restrictions contained in the March 2007 RFC assessment were also permanent and, accordingly, the ALJ erred by not addressing the opinion.

Applying the requisite factors, it appears that Dr. Bell's RFC assessment should have, at a minimum, been acknowledged by the ALJ. Whether the ALJ overlooked, rejected or ignored Dr. Bell's RFC assessment, her decision is inconsistent with the legal standards applicable for determining the weight to a treating physician's opinion and lacks substantial support in the record. *Blakley*, 581 F.3d at 407. Although the ALJ was not bound to Dr. Bell's opinion, she was obligated to articulate "good reasons" based on the evidence of record for not giving weight to the treating physician's RFC assessment. *Wilson*, 378 F.3d at 544. She failed to do so in this case. Accordingly, the ALJ's decision is not supported by substantial evidence and should be reversed and remanded with directions to the ALJ to consider and weigh the RFC assessment of Dr. Bell.

## II.     The ALJ's credibility determination is without substantial support.

Plaintiff's next assignment of error asserts that the ALJ erred in determining that plaintiff's daily activities undermined his credibility with respect to his disabling complaints of pain in light of Social Security Ruling 96-7p.  Ruling 96-7p provides in part:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *1-2 (July 2, 1996).  The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Here, plaintiff testified that he has difficulty walking due to pain and often needs to shift positions, from standing to sitting to laying down, to accommodate his pain.  (Tr. 40-41, 43-44).

31

He further testified that sitting is difficult for more than 20 or 30 minutes, and that he does not do any lifting, even at home. (Tr. 42, 46). Plaintiff also stated that sometimes his pain is so intense he is unable to make a sandwich and just heats something in the microwave to feed himself. (Tr. 43-44).

The ALJ recited the requisite factors in SSR 96-7p and found that plaintiff's subjective complaints were not credible to the extent they were inconsistent with her RFC finding. Specifically, the ALJ noted that plaintiff's activities of daily living were inconsistent with his subjective complaints of pain. (Tr. 20-21). In support, the ALJ provided the following discussion to demonstrate that plaintiff's daily activities are fairly normal and are not indicative of someone with disabling pain:

> [Plaintiff] lives with his wife and daughter. He is able to adequately care for himself. He is able to make sandwiches and use the microwave. He stated that he does some housework sometimes but no outdoor chores. He stated that sleep is a problem sometimes due to pain and his mind races. He stated that he does not often leave his home. He has one friend and does not often see that individual. He does not see his siblings. He watches TV and listens to music. In regards to hobbies, the [plaintiff] said, 'I mess around with the computer a little.'

(Tr. 21) (internal citations omitted). The ALJ also briefly listed plaintiff's medications. (Tr. 18).

The ALJ's credibility finding is without substantial support in the record. With respect to plaintiff's daily activities, the ALJ pointed to plaintiff's ability to make a sandwich, use the microwave, and do some basic household chores. However, the ALJ did not address the manner in which plaintiff is able to do these activities. The ALJ may not selectively reference a portion of the record which casts plaintiff in a capable light to the exclusion of those portions of the record which do not. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240-41 (6th Cir. 2002).

Here, plaintiff testified that "sometimes I can go in and fix a couple sandwiches . . . And if I'm standing there at the stove fixing sandwiches, it might start hurting pretty decent." (Tr. 40-41). Further, plaintiff stated that he usually does not do dishes or housework, but when his wife is away he has to do dishes or they build up. (Tr. 43). The record demonstrates that plaintiff does not regularly cook and clean, as the ALJ suggests, but rather he does so as necessary and with significant pain. Further, the ALJ's finding that plaintiff's daily activities are "normal" are not supported by her own references to plaintiff's difficulties sleeping, his lack of friends and familial relationships, and his statements that he does not often leave his house.

Aside from plaintiff's daily activities, the ALJ did not identify any evidence in the record that contradicted plaintiff's testimony or supported her finding that his subjective complaints of pain were not credible. Notably, Dr. McCloud, the non-examining agency doctor, opined that plaintiff's statements as to his limitations due to pain, achiness, and numbness, were credible. (Tr. 3685). Further, the objective evidence of record supports a determination that plaintiff's subjective complaints are credible in light of his physical impairments. *See* 20 C.F.R. § 1529(c)(2). Plaintiff has exhibited an antalgic gait on multiple occasions (Tr. 3372, 3379, 3539, 3884); MRI results demonstrated an impingement on his left shoulder with a partial rotator cuff tear and severe bilateral L5-S1 foraminal stenosis (Tr. 3152-53, 3634); plaintiff has received multiple corticosteroid injections for back and shoulder pain (Tr. 3372, 3377, 3387, 3874, 3879); and x-rays showed mild anterior wedging at several vertebral levels with significant loss at the T8 level (3689).

The objective medical evidence in the record corroborates plaintiff's subjective complaints of pain and the limiting effects his pain has on his physical abilities. Further, the

agency doctor opined that given plaintiff's physical impairments, his subjective complaints regarding his pain were credible. Accordingly, the ALJ's selective citations to plaintiff's ability to make a sandwich and occasionally do light housework do not fairly portray plaintiff's physical abilities for the relevant time period. Although the ALJ was not bound to accept plaintiff's statements about his physical limitations, she was obligated to provide specific reasons for her determination, taking into account the objective medical evidence, including plaintiff's own methods for dealing with his pain, *i.e.* plaintiff's need to shift positions. She failed to do so in this case and, consequently, plaintiff's second assignment of error should be sustained.

### III. The ALJ did not provide proper hypothetical questions to the VE at the administrative hearing.

Plaintiff's final assignment of error asserts that the ALJ's Step 5 finding is erroneous because she failed to address supported limitations. At the hearing, the ALJ posed a hypothetical to the VE containing Dr. McCloud's physical RFC. Plaintiff contends the ALJ erred by not including the limitations set forth by Dr. Bell's February 2007 assessment, namely that plaintiff was limited to standing and walking for one hour in an eight hour work day. Further, plaintiff asserts the ALJ should have also included the limitations plaintiff testified to – that he often needs to shift positions due to pain.

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden through reliance on a vocation expert's testimony in response to a hypothetical question. To constitute

substantial evidence in support of the Commissioner's burden, the hypothetical question posed to the vocational expert must accurately reflect the claimant's physical and mental limitations. *See Ealy*, 594 F.3d at 516; *Howard,* 276 F.3d at 241; *Varley*, 820 F.2d at 779.

The hypothetical propounded by the ALJ failed to include the limitations imposed by Dr. Bell and thus failed to accurately describe plaintiff's physical limitations. This omission was not harmless error as the VE testified that an individual who was limited to standing one hour at a time or to walking 45 minutes at a time, including needing to shift positions from sitting to standing, would be precluded from work. (Tr. 56). As explained above, the ALJ's RFC assessment, which fails to include Dr. Bell's limitations, is not supported by substantial evidence. Therefore, the ALJ's failure to include these limitations in his hypothetical question to the vocational expert was also in error. *See White v. Comm'r of Social Sec.*, 312 Fed. Appx. 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's physical and mental impairments). Because the ALJ's hypothetical question failed to accurately portray plaintiff's physical impairments, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the jobs identified by the VE. Therefore, plaintiff's final assignment of error should be sustained.

## CONCLUSION

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that remand is appropriate where the ALJ failed to consider evidence of record. *Faucher*, 17 F.3d at 176. Further, vocational errors generally require a remand for further proceedings under Sentence Four of 42 U.S.C. § 405(g).

*See Ealy*, 594 F.3d at 517. Here, the ALJ failed to consider Dr. Bell's RFC assessment and, consequently, the VE's testimony was incomplete. In addition, the current record does not adequately establish plaintiff's entitlement to benefits as of his alleged 2007 onset date. Accordingly, this matter should be remanded for further proceedings, including reconsideration of plaintiff's RFC assessment and credibility, and vocational considerations consistent with this decision.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


Date: 10/20/2011                                         s/Karen L. Litkovitz
                                                          Karen L. Litkovitz
                                                          United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

HARRY LEE TOMBLIN,

     Plaintiff

     vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

     Defendant

Case No. 1:10-cv-888

Dlott, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).